# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ERIC BROOKS,

        Defendant-Appellant.

UNPUBLISHED
December 11, 2014

No. 317402
Wayne Circuit Court
LC No. 12-009957-FH

Before: BORRELLO, P.J., and WILDER and STEPHENS, JJ.

PER CURIAM.

Defendant appeals as of right his jury convictions of assault with a deadly weapon (felonious assault), MCL 750.82, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant to five years' probation for felonious assault, to be served concurrently with a term of two years' imprisonment for felony-firearm. For the reasons discussed below, we reverse and remand for a new trial.

## I. BACKGROUND

Defendant's convictions arise out of an argument with his brother, Michael Brooks ("Michael"), and Michael's friend, Quantz Brock ("Quantz"). Defendant and his mother, over whom he had guardianship, lived in Taylor in defendant's home. Defendant's brother, Michael lived in their mother's home in Detroit. Michael was ordered by the probate court to pay the Detroit home's regular expenses, such as utilities, insurance, and property taxes. Defendant also had a key to the home his brother lived in.

On October 6, 2012, Michael and Quantz were standing outside Quantz's home, located down the street from Michael's residence. Defendant drove past the two in his Jeep, but then stopped and backed up toward them. According to Michael and Quantz, defendant exited the vehicle and began yelling at Michael regarding the bills for their mother's home. When Quantz joined the conversation, defendant told him that the dispute was not his concern. Michael and Quantz testified to different versions of this argument. Michael stated that the argument ended, defendant returned to his vehicle, and drove to their mother's home. Quantz testified that defendant returned to his vehicle, took out a long, metal flashlight, walked back to the two men, and had another 10-minute argument with them before driving to the mother's home.

-1-

Michael and Quantz testified that a few minutes after driving away, defendant drove back to where the men were standing, although the two disagreed as to where this location was. Both agreed that defendant exited the vehicle again, this time carrying a shotgun, which he pointed at them. Michael and Quantz both testified that they ran in opposite directions, yet both testified that they ran to a nearby church's parking lot, and both testified that defendant chased them in his Jeep. Michael testified that he ran to the home of Curtis Marie Dubose ("Dubose"), a neighbor. According to Michael, he asked Dubose to call the police and watched her do so; according to Dubose, Michael used her telephone to call the police himself.

Officers Adam Hess ("Hess") and Brandon Washington ("Washington") responded to the call. They first questioned Michael and Quantz. Michael told them that defendant had driven back to their mother's home, so Hess and Washington drove there. Hess could not remember if he commanded defendant to show his hands, but testified that it was routine practice in response to a call involving a weapon to do so. Washington testified that the first statement he and Hess made to defendant was an introduction of who they were. The officers then questioned defendant regarding the shotgun. Defendant stated that he carried the shotgun with him when he visited Detroit, and that he had placed the gun in a closet in his mother's home. Hess could not specifically remember asking permission to enter the home to recover the weapon, but testified that he would not have done so without consent. The gun was recovered from the location defendant stated it was in.

Defendant testified in his own defense. He stated that he was a former Detroit police officer. He further testified that along with his home in Taylor, he also owned a second home in Detroit, located near his mother's home. According to defendant, he was at his second home earlier in the day keeping watch over it, because the home had been broken into many times. He had the shotgun with him for protection. After leaving his Detroit home the morning of the incident, he drove to his mother's home to check on it, and saw Michael and Quantz. Needing to discuss unpaid bills, he stopped to talk with Michael. Defendant testified that during this discussion, Quantz first threw his jacket to the ground and stepped toward defendant, prompting defendant to retrieve his flashlight from his car. When defendant began talking with Michael again, Quantz gestured as if he had a gun. Believing Quantz was threatening him, defendant retreated to his vehicle. After he entered the Jeep, defendant dropped his keys. As he reached to pick up the keys, he heard Quantz yelling, "He got a gun." Michael and Quantz then ran in opposite directions.

Defendant acknowledged that the shotgun was in his car at the time of the incident, but stated that it was in a case in the rear of the vehicle, unloaded. He stated he never had the gun in his hands and never reached for it during the incident. He testified that he placed the gun in his mother's home because he intended on driving to the police station to file a report regarding the incident and did not want to drive to the police station with the weapon in his vehicle. Defendant also testified that when police approached, he spoke with them and told them the location of the gun, and after this conversation concluded, he was taken into custody.

## II. DISCUSSION

### A. *BATSON* VIOLATION

Defendant first argues that the prosecutor utilized race-based peremptory challenges during jury selection, violating defendant's equal protection rights under the rule established in *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986). We agree.

Our Supreme Court outlined the *Batson* procedure in *People v Knight*, 473 Mich 324, 336-338; 701 NW2d 715 (2005) (citations omitted):

> First, the opponent of the peremptory challenge must make a prima facie showing of discrimination. To establish a prima facie case of discrimination based on race, the opponent must show that: (1) he is a member of a cognizable racial group; (2) the proponent has exercised a peremptory challenge to exclude a member of a certain racial group from the jury pool; and (3) all the relevant circumstances raise an inference that the proponent of the challenge excluded the prospective juror on the basis of race. The United States Supreme Court has made it clear that the opponent of the challenge is not required at *Batson*'s first step to actually prove discrimination. Indeed, "so long as the sum of the proffered facts gives 'rise to an *inference* of discriminatory purpose,' " *Batson*'s first step is satisfied.

> Second, if the trial court determines that a prima facie showing has been made, the burden shifts to the proponent of the peremptory challenge to articulate a race-neutral explanation for the strike. *Batson*'s second step "does not demand an explanation that is persuasive, or even plausible." Rather, the issue is whether the proponent's explanation is facially valid as a matter of law. "A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. . . . Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."

> Finally, if the proponent provides a race-neutral explanation as a matter of law, the trial court must then determine whether the race-neutral explanation is a pretext and whether the opponent of the challenge has proved purposeful discrimination. It must be noted, however, that if the proponent of the challenge offers a race-neutral explanation and the trial court rules on the ultimate question of purposeful discrimination, the first *Batson* step (whether the opponent of the challenge made a prima facie showing) becomes moot.

The correct standard of review depends on which step of the analysis is at issue:

> [T]he proper standard of review depends on which *Batson* step is before us. If the first step is at issue (whether the opponent of the challenge has satisfied his burden of demonstrating a prima facie case of discrimination), we review the trial court's underlying factual findings for clear error, and we review questions of law de novo. If *Batson*'s second step is implicated (whether the proponent of the peremptory challenge articulates a race-neutral explanation as a matter of law), we review the proffered explanation de novo. Finally, if the third step is at issue (the trial court's determinations whether the race-neutral explanation is a pretext

and whether the opponent of the challenge has proved purposeful discrimination), we review the trial court's ruling for clear error. [*Id*. at 345.]

Further, it is of vital importance that the trial court adheres to the three-step *Batson* framework, and that it make a clear record of the basis for its ruling. As our Supreme Court explained:

> Before a reviewing court can determine which standard of review applies for purposes of *Batson*'s three steps, the court must first ascertain what the trial court actually ruled. When a trial court methodically adheres to *Batson*'s three-step test and clearly articulates its findings on the record, issues concerning what the trial court has ruled are significantly ameliorated. See, e.g., *United States v Castorena-Jaime*, 285 F 3d 916, 929 (CA 10, 2002). . . . Our trial courts must meticulously follow *Batson*'s three-step test, and we *strongly* urge our courts to *clearly* articulate their findings and conclusions on the record.

> In the event a trial court fails to clearly state its findings and conclusion on the record, an appellate court must determine on the basis of a fair reading of the record what the trial court has found and ruled. See, e.g., *Mahaffey v Page*, 162 F 3d 481, 482-483 (CA 7, 1998). This is not the preferred route. Because of the importance of the right at stake, as well as the societal and judicial interests implicated, we again direct our trial courts to carefully follow each of *Batson*'s three steps, and we further urge the courts to clearly articulate their findings and conclusions with respect to each step on the record. Once it is determined what the trial court has found and ruled, the reviewing court must decide what *Batson* step is at issue in the particular case and how the claim of error should be reviewed. [*Id*. at 338-339.]

After the jury pool was brought to the courtroom, the trial court explained various aspects of the jury process. The trial court explained the presumption of innocence and the burden of proof applicable to a criminal case. The following colloquy then occurred:

> *The Court*: . . . if I told you to return with a verdict right now, you are presently capable of doing so. Now how is that? Because the defendant is presumed to be innocent until such time as the People are capable, if at all, of proving his guilt beyond a reasonable doubt as to each and every one of the elements of the crime or crimes with which he's charged. And because you haven't heard anything yet, there is at present only one inescapable verdict you could return, and what is that?

> *July* [sic, Jury] *Pool*: Innocent.

> *The Court*: Not Guilty? Really? Not guilty. So now what's going to happen – I hope that that left a lasting impression on your mind. So if I ask you to return with a verdict right now, what would your verdict be?

> *Jury Pool*: Not guilty.

-4-

*The Court*:  Not guilty, that's exactly right.  There's a big difference between "not guilty" and "innocent."  Not guilty means that the People have failed to prove the guilt of the defendant beyond a reasonable doubt, you see?  That's what the difference is.

An initial jury was seated, and each juror was asked to respond to several general questions regarding their background.  The parties were then asked if they wished to exercise any peremptory challenges.  The prosecutor excused three jurors, two of which were African-American.  This prompted defendant to raise a *Batson* challenge.  He noted that the entire jury pool of 24 included only four African-Americans, and thus, the prosecutor's peremptory challenge would remove two of the four.  The prosecutor responded first by arguing that defendant had not demonstrated a pattern of discriminatory strikes, and as such, could not meet *Batson*'s first step, a prima facie case of discrimination.  However, without waiting for a ruling on this first step, the prosecutor then explained the reason for his strikes:

Both of those jurors that I struck happen to be African-American, you in this courtroom give a long, extensive history.  It makes jokes, it tells stories, and you know what?  They all respond to that.  The Court pointed out earlier that there's a difference between not guilty and innocent.  And when you asked the question before you pointed out the difference, both of those jurors, at least [to] my ears, said innocent.  And so for those reasons, that was the reason why I struck them, and there were other jurors.  I don't want to reveal my strategy, but there were other jurors who gave that same answer.

The trial court stated that the prosecutor had provided "a suitable, nondiscriminatory explanation for the challenges which were posed[,]" and denied defendant's challenge.

Defendant excused a single juror, and four members of the jury pool were added to the seated jury.  Each answered background questions, and the parties were asked if they wished to exercise any additional peremptory challenges.  The prosecutor asked to excuse two jurors, one of which, Mr. McGhee ("McGhee"), was African-American.  Defendant renewed his *Batson* challenge.  The prosecutor then explained that "the reason why [he] struck off Mr. McGhee was what [he] alluded to earlier. . . .  Out of all the people that said 'innocent' instead of 'not guilty,' Mr. McGhee was the loudest."  The trial court asked if McGhee's stated familiarity with this type of an incident played into the decision.  The prosecutor responded by explaining that he had hoped defendant would himself excuse McGhee, saving the prosecutor's challenge for later use.  The trial court denied defendant's challenge, stating:

That's a suitable explanation.  The *Batson* challenge is denied.  Strategic decisions can be made so long as strategic decisions are not overshadowed, if you will, by racial[,] gender[,] or age considerations.  So with that in mind, the *Batson* challenge is denied.

In this case, the trial court did not "methodically adhere[] to *Batson*'s three-step test" or "clearly articulate [its] findings and conclusions with respect to each step on the record."  *Id*. at 338-339.  Thus, this Court "must determine on the basis of a fair reading of the record what the trial court has found and ruled."  *Id*. at 339.  Defendant challenges all three steps of the analysis.

-5-

However, because the prosecutor provided an explanation of his decisions and the trial court ruled on the ultimate question, the issue of whether defendant made a prima facie showing is moot. *Id*. at 338. Thus, this Court need only focus on the second and third steps of the *Batson* procedure.

It is clear that the trial court found that the prosecutor's explanation of his peremptory strikes was race-neutral, satisfying the second step of the *Batson* analysis. See *Id*. at 337. Defendant argues that this conclusion was erroneous because it does not meet *Batson*'s command that the reason given be "clear and reasonably specific" and "related to the particular case to be tried." *Batson*, 476 US at 98 and n 20 (quotation marks and citations omitted). We disagree. The prosecutor's explanation was quite clear; according to the prosecutor, he struck the jurors because the challenged jurors responded "innocent" instead of "not guilty" to the trial court's earlier question. This reason was also related to the case to be tried. The prosecutor's explanation was related to how these particular jurors had answered a question posed in this particular case.

Defendant also argues that the prosecutor's explanation was not "persuasive enough" to satisfy this second step. "It is important bear in mind that it is not until *Batson*'s third step that the persuasiveness of the proffered explanation for the peremptory challenge becomes relevant." *Knight*, 473 Mich at 343. "What [*Batson*] means by a 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection." *Purkett v Elem*, 514 US 765, 769; 115 S Ct 1769; 131 L Ed 2d 834 (1995). Thus, the question at this stage of the analysis is not whether defendant, the trial court, or this Court finds the prosecutor's explanation compelling, persuasive, or even plausible. So long as the explanation provided by the prosecutor is "based on something other than the race of the juror" and not inherently discriminatory, the explanation satisfies the second step of the *Batson* analysis. *Knight*, 473 Mich at 337.

After concluding that this second step was satisfied by the prosecutor, the trial court was then required to "determine whether the race-neutral explanation is a pretext and whether the opponent of the challenge has proved purposeful discrimination." *Id*. at 337-338. This inquiry is a factual determination to be made by the trial court, and will largely turn on the prosecutor's credibility. *Id*. at 344-345. However, it does not appear that the trial court made any such factual determination. Regarding the first challenge, the only finding clearly stated by the trial court was that the prosecutor had given "a suitable, nondiscriminatory explanation for the challenges which were posed." The trial court never discussed whether the prosecutor was factually correct in asserting that the excluded jurors responded "innocent" rather than "not guilty" to the question previously posed by the trial court, nor did it state whether the prosecutor's explanation was credible. Instead, the trial court focused largely on what it described as a "very low threshold" for the prosecutor to meet. The trial court explained that "if there can be given an explanation that is not racially motivated . . . then the *Batson* challenge is – should not be allowed." While the second step of the analysis indeed requires a very low threshold showing – providing any race-neutral explanation, regardless of its persuasiveness or plausibility – the third step of the analysis requires more: an evaluation of the explanation, the proponent's credibility, and ultimately, whether the party raising the *Batson* challenge has demonstrated purposeful discrimination. See *id*. at 337-338, 343-345. The trial court appears to have ended its inquiry at the second step, and after finding that a race-neutral reason had been given, denied defendant's challenge.

In regard to defendant's second *Batson* challenge, the prosecutor explained that his reason for excluding a third African-American juror was the same as stated before, and that this particular juror had "said 'innocent' instead of 'not guilty' . . . the loudest." The prosecutor also explained that he had not challenged the juror at the same time as the others because he hoped defendant would use one of his peremptory challenges to strike the juror himself. In explaining its decision to overrule defendant's *Batson* challenge, the trial court stated only that "[s]trategic decisions can be made so long as strategic decisions are not overshadowed, if you will, by racial . . . considerations. So with that in mind, the *Batson* challenge is denied." The trial court did not even address the prosecutor's stated motivation for his peremptory challenge – that the juror had been the loudest to respond "innocent" to the trial court's earlier question. It simply accepted the prosecutor's explanation of why the challenge was not brought earlier.

One problem created by the trial court's failure to state a factual finding regarding the third step of the analysis is that this Court is left to speculate whether the prosecutor's stated reason was factually correct. Taken literally, the transcript states that the entire jury pool first answered "innocent," followed by a uniform response of "not guilty." Thus, the only evidence of record is that every juror responded identically to the questions posed by the trial court. There is no way for this Court to discern whether, in actuality, any particular jurors responded differently to either question, and certainly no way to know whether the particular jurors struck by the prosecutor answered as the prosecutor stated.

The United States Supreme Court has refused to rely on an attorney's explanation of a strike in the face of a *Batson* challenge where the transcript provided no means of verifying the explanation and the trial court made no specific finding regarding the factual basis for the explanation. In *Snyder v Louisiana*, 552 US 472; 128 S Ct 1203; 170 L Ed 2d 175 (2008), the prosecutor provided two reasons for striking an African-American juror, Mr. Brooks. *Id.* at 478. The primary reason cited by the prosecutor was that Mr. Brooks looked nervous. *Id.* The second reason was that Mr. Brooks stated that he might have to miss days of his student teaching assignment, and the prosecutor was concerned that this would lead to a harried decision. *Id.* In regard to the first reason, the Court noted that nervousness could not be discerned from a transcript. *Id.* at 479. While stating that the Court generally would defer to factual findings of a trial court when analyzing the third step of *Batson*, the Court noted that the trial court made no factual finding regarding whether Mr. Brooks actually appeared nervous. The Court refused to rely on the first reason provided by the prosecutor, stating:

> Thus, the trial judge may not have recalled Mr. Brooks' demeanor. Or, the trial judge may have found it unnecessary to consider Mr. Brooks' demeanor, instead basing his ruling completely on the second proffered justification for the strike. For these reasons, we cannot presume that the trial judge credited the prosecutor's assertion that Mr. Brooks was nervous. [*Id.*]

In this case, there is no record evidence to substantiate whether any jurors responded differently to the questions posed by the trial court, and the trial court made no factual finding to which this Court could defer. The trial court may have had the same perception as the prosecutor stated, or may have had no independent recollection of the jurors' responses. While the prosecutor argues that "common sense dictates that not all of the jurors said the same thing," it is also conceivable that the jurors largely, if not uniformly, responded "innocent" to the trial court's

first question. Before this question was asked, the trial court had just explained that "the defendant is presumed to be innocent until such time as the People are capable, if at all, of proving his guilt beyond a reasonable doubt . . . ." A juror responding "innocent" to the trial court's request for a verdict at that time would have been mimicking the language used by the trial court. It was only after this answer was stated by the jury that the trial court then used the phrase "not guilty," and after it did, the transcript states that the entire jury responded "not guilty" when asked the same question again. The prosecutor's position would also ask this Court to assume not only that the jurors provided differing responses, but also to assign responses to the particular jurors struck and those that remained. This Court may not assume that the factual basis for the prosecutor's explanation was correct, and accordingly, may not rely on that basis to affirm the trial court's decision. See *Snyder*, 552 US at 479.

Relying solely on the available record, the prosecutor's explanation does not survive the third step of the *Batson* analysis. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller-El v Dretke*, 545 US 231, 241; 125 S Ct 2317; 162 L Ed 2d 196 (2005). See also *United States v Odeneal*, 517 F 3d 406, 420 (CA 6, 2008) ("unexplained disparate treatment established that the prosecutor's explanation was pretextual and therefore satisfied Defendants' burden under *Batson*."). The transcript states that every juror responded identically to the questions posed by the trial court, and any other conclusion would be speculation. When giving his reason for striking the first two African-American jurors, the prosecutor also stated that "there were other jurors who gave that same answer." "The *Batson* framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process." *Johnson v California*, 545 US 162, 172; 125 S Ct 2410; 162 L Ed 2d 129 (2005). " '[I]t does not matter that the prosecutor might have had good reasons . . . [;] [w]hat matters is the real reason they were stricken[.]' " *Id.*, quoting *Paulino v Castro*, 371 F 3d 1083, 1090 (CA 9, 2004). To that end, courts should avoid "relying on judicial speculation to resolve plausible claims of discrimination." *Id.* at 173. Comparing the prosecutor's explanation to the transcript tends only to prove purposeful discrimination. *Miller-El*, 545 US at 241; *Odeneal*, 517 F 3d at 420.

Even if this Court were to assume that the prosecutor's version of the facts was correct, the prosecutor's explanation cannot satisfy the third step of the *Batson* analysis. The persuasiveness of the prosecutor's explanation is relevant at this stage of the analysis. *Purkett*, 514 US at 768. See also *Knight*, 473 Mich at 343 and n 12. The prosecutor's explanation was simply that these particular jurors answered "innocent," while others answered "not guilty." The prosecutor offered no insight into why he found this distinction important, or why he believed jurors answering "innocent" would be less favorable to the prosecution. While both parties on appeal offer their opinions on why an answer of "innocent" would or would not be favorable to the prosecution, because the prosecutor offered no further explanation, these suggestions are purely speculative. Given that the prosecutor offered no explanation of why the jurors' answers to the trial court's question were of any importance, the explanation was not persuasive.

It is also very unlikely that the prosecutor truly believed that these jurors were mistaken about the difference between the terms "innocent" and "not guilty." Immediately after the jury responded "innocent," the trial court stated, "Not guilty? Really? Not guilty?" The court asked

-8-

the question a second time, and the jury responded "not guilty." The trial court then explained that there was "a big difference between 'not guilty' and 'innocent.' Not guilty means that the People have failed to prove the guilt of the defendant beyond a reasonable doubt, you see? That's what the difference is." This explanation would seem to allay any potential concerns the prosecutor may have had. And, if the prosecutor was legitimately concerned about the jurors' responses, he could have questioned them to ensure they understood the presumption of innocence and burden of proof. Rather than do so, the prosecutor struck the jurors before asking any questions of them. " '[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination[.]' " *Miller-El*, 545 US at 246, quoting *Ex Parte Travis*, 776 So 2d 874, 881 (Ala, 2000).

Further, at the third step of the analysis, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 US at 768. Even assuming the individual jurors provided varying answers to the question, the prosecutor's explanation would require him to have been able to pick out exactly which jurors responded "innocent" and which responded "not guilty" out of a group of 24 voices talking at the same time. That he could have done so seems entirely implausible, particularly when considering that he likely had little familiarity with the juror's voices. On the whole, the prosecutor's explanation was pretext for discrimination, and to the extent the trial court can be understood as ruling otherwise, its ruling was clearly erroneous.

Because a *Batson* error occurred, reversal is required. "A *Batson* error occurs when a juror is actually dismissed on the basis of race or gender. It is undisputed that this type of error is of constitutional dimension and is subject to automatic reversal." *People v Bell*, 473 Mich 275, 293; 702 NW2d 128 (2005).

## B. RIGHT TO A FAIR TRIAL

Although the *Batson* error discussed above requires reversal and a new trial, we also agree that the trial court's extensive questioning of defendant violated defendant's right to a fair trial. "Questions whether a defendant was denied a fair trial . . . are reviewed de novo." *People v Steele*, 283 Mich App 472, 478; 769 NW2d 256 (2009).

MRE 614(b) expressly permits questioning of a witness by the trial court. While "a trial court is free to ask question of witnesses that assist in the search for truth[,]" the trial court may not do so if the questions "give the appearance of partiality." *People v Davis*, 216 Mich App 47, 52; 549 NW2d 1 (1996). "A trial judge may question witnesses to clarify information or to elicit additional relevant information." *People v Ross*, 181 Mich App 89, 91; 449 NW2d 107 (1989). However, the trial court "must exercise caution and restraint to ensure that its questions are not intimidating, argumentative, prejudicial, unfair, or partial." *People v Weathersby*, 204 Mich App 98, 109; 514 NW2d 493 (1994). "A trial court may not assume the prosecutor's role with advantages unavailable to the prosecution." *Id*. "The test is whether the judge's questions and comments may have unjustifiably aroused suspicion in the mind of the jury concerning a witness' credibility and whether partiality quite possibly could have influenced the jury to the detriment of the defendant's case." *People v Cheeks*, 216 Mich App 470, 480; 549 NW2d 584 (1996).

After defense counsel and the prosecutor concluded their examination of defendant, the trial court asked a series of questions. The trial court first asked defendant to confirm that he had testified that he had been a police officer in the past, that the shotgun was in the back of his vehicle at the time of the incident, that he did not pull the shotgun out during the incident, and that he placed the shotgun in his mother's home after the incident. The questioning continued:

*The Court*: All right, now, you indicated that you went to the Strasburg address of your mother's house, 12669 Strasburg, and you put the shotgun in the house.

*A*. Yes.

*The Court*: Is that right?

*A*. Yes, that's correct.

*The Court*: Why did you put the shotgun in the house when you had had the shotgun in the SUV before?

*A*. Because, as I stated I was planning on driving down to the precinct to find out what type of report I could make against what had just happened.

*The Court*: So why would you put the shotgun in the house because you know, being a former police officer, that having an empty shotgun in [a] case in the back end of an SUV, would not be in violation of the law? Would it.

*The Court*: Why didn't you just leave the shotgun in the vehicle as you went down to the police station as opposed to taking it out and putting it in the house?

*A*. Out of habit.

*The Court*: Out of habit.

*A*. I don't drive around with guns in my car. I either take it to the house on Park Grove or to my mother's house while I'm staying there watching the property, okay, and then I bring it back home to my home in Taylor.

*The Court*: Well, Mr. Brooks, before this incident occurred, you were driving the car with the shotgun in the SUV, as you said, in the back end.

*A*. Yes, sir, coming from my house on Park Grove which I had spent the night at and then going to my mother's house on Strasburg to check her house.

*The Court*: My question to you, again, is why would you put the gun in the house on Strasburg?

-10-

*A.* Again, I didn't want to drive to the police station and get stopped on the way.

*The Court*: Why would you even have to drive to the police station? If this incident occurred on Strasburg, why didn't you just use your cellular telephone and call the police and have them come to the scene?

*A.* Because my past dealings of trying to call for a scout car and by it taking so long and the fact that I didn't really know what kind of charge could be brought against my brother or his friend.

*The Court*: But you knew where your brother lived, right?

*A.* That's correct, sir.

*The Court*: You hadn't seen this [Quantz] before, right?

*A.* No, I had not.

*The Court*: But I assume with this conversation that you had with [Quantz] there was some familiarity that you could discern, that you could sense, between your brother and [Quantz] at that time, right?

*A.* Yes, sir.

*The Court*: So you knew that [Quantz] would have been someone that would have been capable of being spoken to by the police, right?

*A.* Yes, sir.

*The Court*: This shotgun didn't have any rounds in it?

*A.* No, sir.

*The Court*: Didn't have any live ammunition in it.

*A.* The rounds were inside my console up towards the front.

*The Court*: Oh, in your console in the SUV?

*A.* Yes.

*The Court*: In the Jeep, okay. And it's a 12 gauge, right?

*A.* Yes, sir.

*The Court*: Can you tell me what that flashlight was on the end of – why that was on the end of that 12 gauge shotgun?

-11-

*A*.  Yes, because on my house on Park Grove, I also have a large metal storage unit where I've had things from out of the house like gardening equipment, power tools, et cetera, because I'm working on the house.  They were inside of there.  They broke into that.  There's no lights inside of there.  So when I come to the house I check that.  I need some kind of illumination for seeing the inside of the trailer or the storage unit.

*The Court*:  Redirect.

Shortly after, defendant objected to the trial court's questioning of defendant and moved for a mistrial on that basis.  The trial court denied the motion, explaining:

Well, the Court is desirous of determining what the truth of this case is, and there were certain questions that had not been asked during the course of both direct and cross examination of [defendant] which the Court saw fit to utilize in trying to clarify certain issues.  And I certainly meant no or had no intention of trying to sway a jury here one way or the other.  And as you have already alluded to, there is, in fact, a specific instruction that the jury is to consider that the statements and the questions of the Court as well are not evidence.

A new trial is required because the trial court's extensive questioning of defendant "may have unjustifiably aroused suspicion in the mind of the jury concerning a witness' credibility and . . . partiality quite possibly could have influenced the jury to the detriment of the defendant's case."  *Id.* at 480.  The trial court's questioning of defendant likely caused the jury to doubt defendant's credibility.  The trial court's exchange with defendant reads like an interrogation.  In essence, the trial court argued with defendant regarding his stated reason for placing the shotgun in his mother's home.  When defendant provided an explanation of his decision, the trial court would not accept that answer, and continued to point to reasons why it believed his explanation was illogical.  The trial court took on the role of prosecutor, and used the exchange as an opportunity to argue whether defendant's explanation was believable.  This exchange likely sent a clear message to the jury – that defendant was not credible.

Further, given that the entire trial was essentially a credibility contest between Michael, Quantz, and defendant, this "partiality quite possibly could have influenced the jury to the detriment of the defendant's case."  *Id*. at 480.  Indeed, there were numerous inconsistencies between Michael's testimony and Quantz's testimony.  For example, the two did not agree regarding when defendant had a flashlight in his possession, whether defendant ever threatened Quantz with the flashlight, or where the altercation with the shotgun took place.  The two agreed they ran in opposite directions, yet each claimed to have run toward the church parking lot, and both claimed to have been chased by defendant in his Jeep.  Ultimately, the jury was left to determine whether Michael and Quantz were more credible than defendant.  The trial court's questioning of defendant, which likely caused the jury to question his credibility, "quite possibly could have influenced the jury to the detriment of . . . defendant's case."  *Id*.

The prosecutor cites *Davis*, 216 Mich App 47, as support for its argument that the trial court did not deny defendant a fair trial through its questioning on defendant.  In *Davis*, this Court cited with approval the Sixth Circuit Court of Appeals' holding that a trial court could:

interject itself into the trial: (1) when the trial is lengthy and complex, (2) when attorneys are unprepared or obstreperous, or if the facts become confused and neither side is able to resolve the confusion, and (3) when a witness is difficult or is not credible and the attorney fails to adequately probe the witness, or if a witness becomes confused. [*Id*. at 49-50, citing *United States v Dandy*, 998 F 2d 1344, 1354 (CA 6, 1993).]

The *Davis* Court also "note[d] that there might be situations in which attorneys for both sides avoid asking a witness a material question on the (traditional in some quarters) ground that counsel never ask a question without first knowing the answer." *Id*. at 50. The prosecutor only cites this language, however, and does not identify which portion or portions of *Davis* it believes apply. However, none of the areas identified in *Davis* seem to apply here. The case was not long or complex; the first witness was called at approximately 2:00 p.m. the first day, and the last witness completed his testimony at approximately 2:30 the following day. There was no indication that the attorneys were unprepared or unruly, or that there was any confusion that the attorneys could not address. There was also nothing inherently unbelievable about defendant's testimony, nor was he difficult or confused. While it may have been legal for defendant to drive to the police station with a shotgun in his car, there was no requirement that he do so. He was also not required to call the police rather than report the incident in person. His answers were reasonable explanations of his preference of how to handle the situation. Thus, it is unclear how *Davis* could support the trial court's questioning of defendant.

The prosecutor also argues that because the trial court questioned nearly every witness, its questioning of defendant cannot establish bias, as the trial court treated every witness the same. However, a review of the record demonstrates that the trial court's questioning of defendant was qualitatively different than its questioning of other witnesses. The trial court questioned Michael only regarding whether he knew the difference between a rifle and a shotgun, and whether he was able to identify which type of gun defendant pointed at him. This line of questioning was appropriate, as Michael first testified that defendant pointed a rifle at him, but then stated that "[i]t was like a shotgun." When the prosecutor attempted to clarify these statements, Michael stated, "It was a rifle, like a shotgun." The trial court appropriately attempted to resolve this confusion. *Davis*, 216 Mich App at 49-50 (the trial court may question a witness "if the facts become confused and neither side is able to resolve the confusion . . . ."). Further, when Michael explained the reason for his confusion, the trial court did not challenge his explanation, as it did when questioning defendant.

Similarly, the trial court's questioning of Quantz was aimed only at clearing up an apparent discrepancy in his testimony. During his testimony, Quantz stated that he looked at the gun for "[p]robably about two minutes, and [he] ran." On cross-examination, Quantz stated that he ran immediately after he saw the gun. Yet in regard to how long it took before he ran, he then maintained that "all it took was two minutes." The prosecutor attempted to clarify this issue by asking if Quantz timed himself while he was looking at the gun. The trial court then tried to clarify the issue, questioning Quantz to determine whether his use of the phrase "two minutes" should be taken literally or figuratively, going so far as to have Quantz demonstrate exactly how much time it took for him to run after seeing the gun. Once again, the trial court's questioning of Quantz was appropriately aimed at resolving confusion created by Quantz's testimony. *Id*.

The trial court asked only a single question of Dubose, asking her to describe Michael's appearance when he came to her home. The trial court's questioning of Hess was more extensive, but the trial court sought only factual information from Hess to clarify his testimony, such as whether certain facts were in his report, who he and Washington spoke with, the appearance of Michael and Quantz, and the circumstances of defendant's arrest. The trial court did not question the remaining witnesses. In sum, while the trial court did question five of the nine witnesses, it almost universally sought to clarify the testimony provided and elicit additional facts about what transpired. However, when it questioned defendant, the trial court argued with him and openly questioned his credibility. If anything, a comparison of the trial court's questioning of the witnesses only further demonstrates that the trial court's conduct demonstrated bias.

"When questions cross the line of judicial impartiality, this Court applies the harmless-error test." *Id*. at 51. We do not find the error harmless. As discussed, the case was essentially a credibility contest, and the trial court's questioning was directly aimed at undermining defendant's credibility. Further, the prosecutor seized on this exact line of questioning during his closing argument, arguing that it was "one of the most telling pieces of the entire trial." Given that the case was a credibility contest and the prosecutor seized on the trial court's questioning as "one of the most telling pieces of the entire trial" regarding defendant's credibility, the trial court's improper questioning of defendant was not harmless, and reversal is required.

## C. RIGHT TO CONFRONTATION

Defendant next argues that his right to confront the witnesses against him was violated when the trial court precluded him from questioning Michael regarding his substance abuse history. We disagree. Because defendant did not preserve this issue by raising it below, we review the issue for plain error affecting substantial rights. *People v Hanks*, 276 Mich App 91, 92; 740 NW2d 530 (2007). "To establish plain error requiring reversal, a defendant must demonstrate that 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id*. (quotation marks and citation omitted).

"Few rights are more fundamental than that of an accused to present evidence in his or her own defense." *People v Unger*, 278 Mich App 210, 249; 749 NW2d 272 (2008). This right is protected by United States and Michigan constitutions. *Id*. at 249-250. The right of confrontation encompasses the right to cross-examine a witness. *Chambers v Mississippi*, 410 US 284, 295; 93 S Ct 1038; 35 L Ed 2d 297 (1973). However, "[t]he Confrontation Clause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *United States v Owens*, 484 US 554, 559; 108 S Ct 838; 98 L Ed 2d 951 (1988) (internal quotation marks and citations omitted). "The right of cross-examination . . . may bow to accommodate other legitimate interests of the trial process or of society." *People v Adamski*, 198 Mich App 133, 138; 497 NW2d 546 (1993).

Defendant claims that the trial court violated his right to confrontation by prohibiting him from eliciting testimony regarding Michael's past substance abuse history on cross-examination. On the first day of trial, defendant questioned Michael regarding an accident that occurred several years before, in which Michael injured his hand. Michael acknowledged that the injury

occurred when he passed out near a fence, and his "arm was tangled in between the banister." Defendant asked if Michael had passed out "due to any kind of abuse[.]" The prosecutor objected, and a sidebar was held. After the sidebar, defendant asked Michael, "When this accident occurred causing your disability, did you pass out due to substance abuse?" After Michael responded in the negative, defendant stated that he had "no other questions." While the prosecutor initially objected to defendant's question to Michael, the record shows that, after a sidebar, defendant was allowed to ask the question. Defendant did not seek to elicit any testimony regarding Michael's supposed long-term substance abuse history, and as such, cannot now claim that the trial court unfairly deprived him of the right to elicit this testimony on cross-examination.

## D.  PROSECUTORIAL MISCONDUCT

Defendant next argues that he was denied a fair trial by several instances of prosecutorial misconduct. We disagree. To preserve a claim of prosecutorial misconduct, the defendant must make a "timely, contemporaneous objection and request for a curative instruction." *People v Callon*, 256 Mich App 312, 329; 662 NW2d 501 (2003). Defendant failed to preserve any of his challenges by doing so. Because defendant failed to preserve his claims of prosecutorial misconduct, the issue is reviewed for plain error affecting substantial rights. *Id*. Under this test, defendant must show that plain error affected his substantial rights, meaning that the plain error affected the outcome of the proceedings. *People v Pipes*, 475 Mich 267, 279; 715 NW2d 290 (2006). "Further, [this Court] cannot find error requiring reversal where a curative instruction could have alleviated any prejudicial effect." *Callon*, 256 Mich App at 329-330.

"The key test in evaluating claims of prosecutorial misconduct is whether the defendant was denied a fair and impartial trial." *People v Watson*, 245 Mich App 572, 594; 629 NW2d 411 (2001). Such claims are evaluated case by case. *People v Dobek*, 274 Mich App 58, 64; 732 NW2d 546 (2007). "When reviewing a claim of prosecutorial misconduct, this Court must examine the pertinent portion of the record and evaluate a prosecutor's remarks in context." *Callon*, 256 Mich App at 330. Whether a prosecutor's remarks amount to misconduct "depend[s] upon the particular facts of each case." *Id*. The prosecutor's remarks "must be read as a whole and evaluated in light of defense arguments and the relationship they bear to the evidence admitted at trial." *Id*.

Defendant raises three instances of alleged prosecutorial misconduct. First, he argues that the prosecutor committed misconduct by asking Angie Gross ("Gross"), a neighbor who testified to witnessing the incident, "If I had you tested right now, would you pass a drug test?" After Gross admitted that she had not reported her version of events to police until the day before trial, the following exchange occurred:

> *Q*. And that's yesterday when you made this statement to the police officer?
>
> *A*. Correct.
>
> *Q*. Right? Let me ask this. When you made this statement to the police officer, were you sober?

-15-

*A.* Yeah – I mean yes.

*Q.* Did you have anything to drink before you made this statement?

*A.* No.

*Q.* Were you high when you made this statement?

*A.* No.

*Q.* If I had you tested right now, would you pass a drug test?

*Defense Counsel*: Objection, Your Honor, what is the relevance?

*A.* Yes.

The trial court overruled defendant's objection on relevancy grounds. Defense counsel asked if the prosecutor had a legitimate basis for asking the question, and the prosecutor stated he did. The trial court restated that the objection was overruled, and asked the prosecutor to continue.

Defendant argues that the prosecutor's question indicated that he had special knowledge of the witness not in evidence. As a general matter, a prosecutor may not imply that he or she has special knowledge of a witness's truthfulness. *People v Thomas*, 260 Mich App 450, 455; 678 NW2d 631 (2004). However, in regard to the prosecutor's question to Gross, we are precluded from finding error requiring reversal because a curative instruction was not requested, and such an instruction could have alleviated any prejudicial effect. *Callon*, 256 Mich App at 329-330. Had defendant properly objected and requested a curative instruction, the trial court could have instructed the jury that the prosecutor's question was not evidence, and should not be interpreted as suggesting any special knowledge of her credibility. See M Crim JI 2.7 ("The questions lawyers ask the witnesses are not evidence. Only the answers are evidence. You should not think that something is true just because one of the lawyers asks questions that assume or suggest that it is.").

Defendant next argues that the prosecutor committed misconduct by asking defendant if Gross had lied while testifying. The entire exchange between the prosecutor and defendant is as follows:

> *Q.* Yes, I'm sorry, on October 6th, not August 6th. October 6th when you first saw your brother and Quantz Brock – and first of all, you saw them outside, right?
>
> *A.* Yes, I did.
>
> *Q.* So when Angie Gross testified earlier that she was on the porch three or four minutes and then saw Quantz Brock come out, she was lying, right?
>
> *A.* No, she was not.

-16-

*Q*. When you saw your brother and Quantz Brock, you saw them at the same time, they were both outside together, right?

*A*. That's correct.

*Q*. Okay. So when she testified that she saw him come outside, that can't be possible, can it?

*A*. I can't testify to what she saw.

*Q*. But you can testify to impossibility, can't you?

*A*. No, I cannot.

*Defense Counsel*: You can't comment on other testimony in court.

*The Prosecutor*: He can because he was sitting here the entire time. He's the defendant.

*The Court*: The objection is sustained actually. Go on.

This Court is again precluded from finding error requiring reversal because no cautionary instruction was requested, and such an instruction could have cured any prejudicial effect. *Callon*, 256 Mich App at 329-330. Had defendant objected and requested an instruction, the trial court could have instructed the jury to disregard the question and answer, and instructed the jury that it was their duty to decide the credibility of witnesses. See *People v Buckey*, 424 Mich 1, 18; 378 NW2d 432 (1985) (where the prosecutor asked the defendant whether various witnesses had lied during their testimony, a timely objection or request for a cautionary instruction could have cured any prejudice); M Crim JI 2.6(1) ("You must decide which witnesses you believe and how important you think their testimony is. You do not have to accept or reject everything a witness says. You are free to believe all, none, or part of any person's testimony.").

Further, defendant has not demonstrated prejudice. Citing to *People v Buckey*, 133 Mich App 158; 348 NW2d 53 (1984), rev'd, 424 Mich 1 (1985),[1] he argues only that "[t]his form of questioning is prohibited." Defendant offers no explanation of how the prosecutor's question caused him any prejudice. That said, the jury, having heard Gross's testimony, would have been aware of the inconsistency between her testimony and defendant's testimony. The prosecutor

---

[1] In *Buckey*, this Court found that the prosecutor committed misconduct by asking the defendant his opinion on whether several witnesses lied during their testimony. *Buckey*, 133 Mich App at 161-163. This Court found the questions prejudicial because the case was a "classic credibility contest between the complainant and the defendant . . . ." *Id*. at 163. Our Supreme Court reversed on this issue, finding that, while the questioning was improper, there was no reason to believe the defendant suffered prejudice from the questioning, and that a cautionary instruction could have cured any potential prejudice. *Buckey*, 424 Mich at 16-18.

pointed out this inconsistency during his closing argument. While the prosecutor should not have asked defendant to comment on the veracity of Gross's testimony, see *Buckey*, 424 Mich at 17, defendant testified that Gross was not lying, leaving the jury to determine what effect the conflicting testimony had on Gross's credibility. We find no prejudice stemming from the prosecutor's questioning of defendant.

Finally, defendant argues that the prosecutor committed misconduct by instructing the jury that, if they convicted defendant of felonious assault, they must also convict defendant of felony-firearm. The prosecutor's argument was as follows:

> And for that first charge, felonious assault, I had to show you two things. Either that there was an assault or a battery, okay, because those are two different things and that assault and battery occurred with a weapon. In this case we're saying it's either a rifle or a shotgun.
>
> * * *
>
> The first part you have to find, that it was used in an assault. Meaning that I have to prove beyond a reasonable doubt that [defendant] pointed this gun at Michael Brooks, okay. That's for that first charge. And if you think the elements have been met for that first charge and you've already found this to be either a shotgun or a rifle, then you have to find him guilty of the second charge. Because if you find him guilty of the first charge, then you're saying that he did possess it. If he possessed it while pointing it at somebody else, that's another felony, the second part of that, and therefore he's guilty of both those crimes. Okay.

Defendant argues that the prosecutor committed misconduct by inaccurately instructing the jury on the law, as there is no requirement that a jury return consistent verdicts. Once again, this Court may not reverse because defendant did not object and request a cautionary instruction. Had defendant done so, the trial court could have immediately instructed the jury on the elements of each crime, and instructed it to consider each crime separately. Further, any prejudice to defendant was actually cured when the trial court instructed the jury on the elements of each crime, and instructed the jury to "consider each crime separately" and that it could "find the defendant guilty of both of these crimes, either one of these crimes[,] or not guilty of these crimes." "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003). Furthermore, taken in context, the prosecutor's remarks were proper. The prosecutor was merely pointing out that, if the jury convicted defendant of committing a felonious assault with a gun, the elements of felony-firearm were also satisfied. This was an accurate statement of the law.[2] Defendant's argument lacks merit.

---

[2] The elements of felony-firearm are (1) the commission or attempted commission of a felony while (2) carrying or possessing a firearm. *People v Burgenmeyer*, 461 Mich 431, 438; 606 NW2d 645 (2000).

## E.  RIGHT TO COUNSEL

Finally, defendant argues that he was denied the effective assistance of counsel.  We disagree.  To preserve a claim of ineffective assistance of counsel, a defendant must move for a new trial or for a *Ginther*[3] hearing in the trial court.  *People v Armendarez*, 188 Mich App 61, 73-74; 468 NW2d 893 (1991).  "Failure to so move usually forecloses appellate review unless the appellate record contains sufficient detail to support a defendant's claims; if so, review is limited to the record."  *Id.* at 74.  Defendant did not move for a new trial or for a *Ginther* hearing in the trial court.  Thus, the issue is unpreserved, and review is limited to the record.  "A claim of ineffective assistance of counsel presents a mixed question of law and fact.  This Court reviews a trial court's findings of fact, if any, for clear error, and reviews de novo the ultimate constitutional issue arising from an ineffective assistance of counsel claim."  *People v Brown*, 294 Mich App 377, 387; 811 NW2d 531 (2011) (citations omitted).

The United States and Michigan constitutions guarantee the right to counsel.  US Const, Am VI; Const 1963, art 1, § 20.  See also *People v Swain (On Remand)*, 288 Mich App 609, 643; 794 NW2d 92 (2010).  This right "includes the right to the effective assistance of counsel." *Swain*, 288 Mich App at 643.  "Effective assistance of counsel is presumed, and a defendant bears a heavy burden to prove otherwise."  *Id*.  "To prove a claim of ineffective assistance of counsel, a defendant must establish that counsel's performance fell below objective standards of reasonableness and that, but for counsel's error, there is a reasonable probability that the result of the proceedings would have been different."  *Id*.

Defendant first argues that trial counsel was ineffective for failing to seek suppression of defendant's statements made to police.  He argues that these statements were obtained in violation of *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).  Defendant's argument lacks merit.  It is undisputed that defendant answered questions asked by police without having received *Miranda* warnings.  However, *Miranda* warnings are only required if a defendant is to be subjected to a *custodial* interrogation.  *People v Elliott*, 494 Mich 292, 301; 833 NW2d 284 (2013).  If no custodial interrogation took place, then defendant's statements were admissible.  *Id*.  A "custodial interrogation" is " 'questioning initiated by law enforcement officers *after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way*.' "  *Id*. at 305, quoting *Miranda*, 384 US at 444 (emphasis supplied).

Defendant asserts on appeal that he answered police questions after being ordered to "freeze" and was handcuffed.  The record belies his assertion.  Defendant and Hess testified that the officers took defendant into custody only after discussing the location of the gun.  Defendant was described as cooperative during this discussion, which occurred outside his mother's home.  While Hess stated that it was standard practice in such a situation to order a suspect to show his hands, Washington testified that the first interaction the officers had with defendant was to introduce themselves to him.  In sum, the record shows only that officers approached defendant and conversed with him without placing any limitations on defendant's freedom.  Thus, as there was no custodial interrogation, there was no *Miranda* violation.  Further, *Miranda* does not

---

[3] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

prevent officers from asking questions "reasonably prompted by a concern for the public safety." *New York v Quarles*, 467 US 649, 656; 104 S Ct 2626; 81 L Ed 2d 550 (1984). The officers were called to the scene to respond to a report that defendant had pointed a gun at two other individuals. With that knowledge in hand, questions aimed at discovering the location of that gun would be prompted by the officer's concern for public safety, and would not raise a *Miranda* issue. *Id*. Because defendant's statements could not be suppressed under *Miranda*, trial counsel was not ineffective for failing to seek suppression. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

Defendant next argues that trial counsel was ineffective for failing to seek suppression of the shotgun, as he believes the gun was obtained in violation of defendant's right against unreasonable searches and seizures under the Fourth Amendment. As this Court stated in *People v Brown*, 279 Mich App 116, 130; 755 NW2d 664 (2008) (quotations and citations omitted):

> US Const, Am IV, and Const 1963, art 1, § 11, guarantee the right of the people to be free from unreasonable searches and seizures. However, this right is personal and may not be invoked by third parties. For an individual to assert standing to challenge a search, the individual must have had a legitimate expectation of privacy in the place or location searched, which expectation society recognizes as reasonable. The defendant has the burden of establishing standing, and in deciding the issue, the court should consider the totality of the circumstances. Factors relevant to the determination of standing include ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

Defendant has not demonstrated that he had standing to challenge the search of his mother's house, where he had placed the shotgun. At trial, defendant testified that he owned two homes, one was his principal residence in Taylor, and the other was in Detroit. Regarding his mother's home, where the gun was found, defendant testified that he had a key to the home, but he did not live there, and that he was only in the area on the day of the incident to check on the house. It is undisputed that Michael was the sole resident of the home, where he had lived for over 30 years. There is no evidence of record that would tend to show defendant had any expectation of privacy in his mother's home.

Defendant states, with no citation to the record or to legal authority, that he "had standing to contest the search because he was the court-appointed guardian and had been given authority over the premises." That he was his mother's guardian may have provided defendant with authority to handle matters on his mother's behalf, but does not demonstrate any expectation of privacy in a home owned by her, but lived in by Michael. While Michael testified that defendant was given authority to take care of the house through a court order, the scope of this authority was not discussed. As the record does not demonstrate that defendant had standing to challenge the search, defense counsel had no ability to challenge the search on Fourth Amendment grounds. *Brown*, 279 Mich App at 130. "Failing to advance a meritless argument or raise a

futile objection does not constitute ineffective assistance of counsel." *Ericksen*, 288 Mich App at 201.

Even if defendant had standing to challenge the search, the record indicates that defendant consented to the search. A warrantless search does not violate the Fourth Amendment if police obtain consent for the search. *People v Dagwan*, 269 Mich App 338, 342; 711 NW2d 386 (2006). "Generally, that consent must come from the person whose property is being searched or from a third party who possesses common authority over the property." *Brown*, 279 Mich App at 131. Hess testified that he believed he asked defendant if he could retrieve the gun from inside the home, that he understood he needed consent to search the home, and that he would not have entered without obtaining consent. Because the record indicates only that defendant consented to the search, the search was no ground to suppress the shotgun. Once again, "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *Ericksen*, 288 Mich App at 201.

Defendant next argues that counsel was ineffective for failing to introduce evidence demonstrating Michael's motive to fabricate his testimony. This evidence consists of a detailed history of the proceedings regarding defendant's guardianship of his mother. "Defense counsel's failure to present certain evidence will only constitute ineffective assistance of counsel if it deprived defendant of a substantial defense." *People v Dunigan*, 299 Mich App 579, 589; 831 NW2d 243 (2013). "Moreover, decisions regarding what evidence to present and which witnesses to call are presumed to be matters of trial strategy, and we will not second-guess strategic decisions with the benefit of hindsight." *Id*. at 589-590. Defendant was not deprived of a substantial defense. During his cross-examination of Michael, defense counsel elicited testimony regarding Michael's history of living in the home, his failure to pay expenses, and whether there was a dispute between defendant and Michael caused by the situation. Thus, the area defendant argues should have been explored by defense counsel was explored by trial counsel, albeit in less detail. Further, the evidence defendant alleges should have been presented by defense counsel is, by the very nature of defendant's argument, evidence that is not part of the record. Because defendant did not file a motion for a *Ginther* hearing or a new trial in the trial court, this Court is limited to the record when evaluating defendant's claim. *Armendarez*, 188 Mich App at 73-74. A defendant pressing an ineffective assistance claim must demonstrate the factual predicate for his claim. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). Because the evidence defendant argues should have been presented is not part of the existing record, and this Court is limited to the record, his argument must fail.

Finally, defendant argues that trial counsel was ineffective for failing to object to the prosecutor's questioning of defendant regarding whether Gross lied in her testimony and the prosecutor's description of the elements of the offenses. While trial counsel should have immediately objected to the prosecutor's questioning of defendant regarding whether Gross had lied when testifying, defendant has not demonstrated prejudice arising from this failure, and no prejudice is apparent from the record. With regard to the prosecutor's closing argument, the prosecutor did not erroneously state the elements of the offense, and accordingly, there was no objection to be made by trial counsel. Further, any potential prejudice was cured by the trial court's instructions regarding the elements of the offenses and that the jury was free to find defendant guilty of any combination of offenses. Defendant's argument lacks merit.

The final paragraph of defendant's brief argues that the cumulative effect of trial counsel's alleged errors demonstrates prejudice, even if the individual errors do not. "It is true that the cumulative effect of several errors can constitute sufficient prejudice to warrant reversal where the prejudice of any one error would not." *People v LeBlanc*, 465 Mich 575, 591; 640 NW2d 246 (2002). However, as there are no errors causing defendant prejudice, there can be no cumulative prejudice.

Reversed and remanded for a new trial. We do not retain jurisdiction.

/s/ Stephen L. Borrello
/s/ Kurtis T. Wilder
/s/ Cynthia Diane Stephens